# United States Court of Appeals
## For the First Circuit

No. 19-1667

UNITED STATES OF AMERICA,

Appellee,

v.

LAURA G. MARTINEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Lipez, and Barron,
Circuit Judges.

Ralph A. Jacobs for appellant.

Lauren S. Zurier, Assistant United States Attorney, with whom
Aaron L. Weisman, United States Attorney, was on brief, for
appellee.

August 13, 2021

**LIPEZ, Circuit Judge.** Appellant Laura Martinez pled guilty to cocaine distribution and conspiracy charges that carried a five-year mandatory minimum sentence. After careful consideration during a lengthy sentencing proceeding, the district court denied Martinez safety-valve relief, concluding that she had not met her duty of disclosure to the government, see 18 U.S.C. § 3553(f)(5), and imposed the mandatory five-year term of imprisonment. Martinez appeals, arguing that the district court erred in finding that she was not eligible for the safety valve on the ground that she provided untruthful or incomplete information to the government. We affirm.

**I.**

We draw the facts from the undisputed portions of the presentence-investigation report ("PSR"), the plea colloquy, and the transcript of the sentencing hearing. See, e.g., United States v. Rivera-González, 776 F.3d 45, 47 (1st Cir. 2015). We also rely on the transcripts of Martinez's safety-valve interviews.[1]

**A. The Traffic Stop**

The charges in this case arose out of Martinez's involvement in the transport of approximately five kilograms of

---

[1] Martinez is a native Spanish speaker and communicated with the government and the court through an interpreter. We rely on the English translations of the evidence, Martinez's testimony, and the safety-valve interviews provided by the parties in the record. We disclose any ambiguities or translation notes where relevant.

cocaine from New York to Rhode Island. Specifically, on February 21, 2017, Martinez traveled in her red Buick van from Rhode Island to New York and back to Rhode Island with her boyfriend, Willy Espinal. Not far from their ultimate destination (Providence, Rhode Island), Martinez and Espinal were stopped by Rhode Island State Trooper James D'Angelo for a traffic violation and for driving with an expired registration. Because Espinal and Martinez both presented suspended licenses, Trooper D'Angelo called for a towing service.

While waiting for the tow, D'Angelo commenced an inventory of the vehicle during which he discovered that a flat metal sheet had been welded to the vehicle's frame, creating a false floor below the factory-manufactured floor. Based on D'Angelo's experience and specialized training in narcotics trafficking, he believed the vehicle alterations were consistent with the manufacture of a "hide" or a "trap," which is typically used to conceal drugs or other contraband.

At D'Angelo's request, a second patrol vehicle with two additional officers and a drug-sniffing canine ("K-9") arrived on the scene. The K-9, named Chuck, conducted an air sniff of the exterior of the vehicle and alerted to the presence of narcotics. Chuck also alerted to the presence of narcotics during an interior air sniff of the vehicle. The officers inspected the area that Chuck identified and located a hide. D'Angelo was able to gain

access to the hide and discovered approximately five kilograms of cocaine inside.  Both Espinal and Martinez were placed under arrest.

## B.    Martinez's Cell Phone

Martinez's cell phone was seized upon her arrest. Government agents later performed a data extraction and searched the contents of the phone for information relating to the transport of narcotics.  Agents recovered a video on Martinez's phone of the hide in her vehicle in an opened position.  There were also several photos of hundreds of thousands of dollars in cash on Martinez's phone.   Metadata confirmed that both the video and the photos were taken with the camera on Martinez's phone months before her trip to New York.  Agents also recovered images of two documents: (1) a federal indictment from the Southern District of New York charging several individuals in New York and Rhode Island with conspiracy to deliver five kilograms of cocaine, and (2) a Department of Justice press release reporting the indictment of several individuals for narcotics trafficking in Boston.

Multiple text messages and conversations on WhatsApp (a smartphone messaging application) were also recovered from Martinez's phone and translated from Spanish to English.  In one WhatsApp message thread, Martinez corresponded with a number saved in her phone as "Gordo," later determined to be her ex-boyfriend, Oniel DeLeon.  The messages spanned several months, during which

Gordo and Martinez appeared to discuss drug trafficking and sent each other weblinks to various articles about drug trafficking in New England and the Dominican Republic.[2]

## C.   The Plea

On April 6, 2017, a federal grand jury in the District of Rhode Island returned a two-count indictment charging both Espinal and Martinez with one count of possession with intent to distribute 500 grams or more of cocaine and one count of conspiring to possess with intent to distribute the same.  The indictment also contained a forfeiture allegation.  About a month later, a superseding indictment added allegations of Pinkerton[3] liability and aiding and abetting to the possession count.

Martinez agreed to plead guilty if the conspiracy charge -- which alleged a conspiracy only between her and Espinal -- was modified to reflect a broader conspiracy that excluded Espinal. The government agreed and filed an information against Martinez that alleged a broader conspiracy with persons other than Espinal.

---

[2] The relevant portions of these text message and WhatsApp conversations are reproduced below as part of our discussion of Martinez's safety-valve eligibility.

[3] Under Pinkerton v. United States, 328 U.S. 640 (1946), "a defendant can be found liable for the substantive crime of a coconspirator provided the crime was reasonably foreseeable and committed in furtherance of the conspiracy."  United States v. Vázquez-Botet, 532 F.3d 37, 62 (1st Cir. 2008).

Martinez then pled guilty to both charges without a written plea agreement. Espinal was acquitted after a trial that was overseen by then-Chief Judge William E. Smith, the same district judge who accepted Martinez's guilty plea and sentenced her.

## D.   Safety-Valve Eligibility

### 1.   Overview

Martinez's guilty plea exposed her to a mandatory minimum sentence of five years. Before sentencing, she agreed to meet with government agents in an attempt to qualify for application of the "safety-valve" provision of 18 U.S.C. § 3553(f). Pursuant to § 3553(f), if the court finds at sentencing that the defendant satisfies five prerequisites, it "shall impose a sentence pursuant to [the Sentencing Guidelines] without regard to any statutory minimum sentence." The government concedes that Martinez met the first four requirements.[4] The fifth requirement,

---

[4] The first four prerequisites for safety-valve relief are:

(1) the defendant does not have (A) more than 4 criminal history points . . .; (B) a prior 3-point offense . . .; and (C) a prior 2-point violent offense . . .;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person; [and]

(4) the defendant was not an organizer, leader, manager, or supervisor of others in

and the only one at issue in this appeal, requires the court to make a finding that, "not later than the time of the sentencing hearing, the defendant has truthfully provided to the [g]overnment all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."  18 U.S.C. § 3553(f)(5).  However, "the fact that the defendant has no relevant or useful other information to provide or that the [g]overnment is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement."[5]  Id.

### 2.    First Safety-Valve Interview

Seeking   to   meet   the   disclosure   obligation   of § 3553(f)(5), Martinez first met with government attorneys and investigators on December 20, 2018 -- before sentencing.  At the start of the interview, Martinez was asked to describe generally the circumstances of her crime, including how the five kilograms of cocaine got into the hide in her van.

---

the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act[.]

18 U.S.C. § 3553(f).

[5] The statute also provides that any "[i]nformation disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense."  18 U.S.C. § 3553(f)(5).

Martinez began her explanation by stating that on February 21, 2017 -- the day of her arrest -- she had asked her boyfriend, Espinal, to accompany her while she drove her grandmother from Rhode Island to her aunt's house in New York. Espinal agreed, and Martinez stated that they traveled directly to her aunt's apartment to drop off her grandmother. Shortly after they reached her aunt's apartment, Gerald Ortiz, Martinez's cousin, arrived, took her cell phone and the keys to her van, and left. Martinez estimated that Ortiz was gone for about two hours, and she insisted that she and Espinal remained at her aunt's apartment during that period. Martinez recounted that, when Ortiz returned, she "had a small argument" with him because she had been told "it was only one. That they were going to pay [her] $2,000. When [Ortiz] arrived, he told [her] they ha[d] put two."[6] Martinez said that she "got very nervous. [She] said no. But [Ortiz] told [her] [she] c[ould] not go back," or "take it back." Martinez explained that she was so nervous that she cancelled plans to see a friend in New York and immediately left for Rhode Island. She also confessed that on the return trip, she was in regular contact with Gordo -- her ex-boyfriend -- and that although she was

---

[6] Although she did not say so affirmatively, context demonstrates that the interview participants understood that Martinez was referring to "one" and "two" kilograms of cocaine.

initially driving, she got an upset stomach and Espinal drove until the pair was pulled over in Rhode Island.

After hearing her initial explanation, government agents pressed Martinez for more information. Martinez stated that Ortiz and her ex-boyfriend Gordo had planned "everything." She explained that she was having trouble paying her bills, and Gordo offered to pay her for simply driving to New York and back. The agents asked Martinez whether she had previously transported narcotics. She responded, "[n]ever before. Th[is] was my first." The agents asked whether Martinez and Gordo had ever talked about drugs. Martinez replied, "No. He always kept, um, giving me hints and indirect, um, ideas, but I always said no, no." Martinez insisted, "[h]e never talked with me [about drugs], but that's why I withdrew, g[ot] away from him, because I knew what he was doing. Of course I knew."

The agents asked Martinez how she had acquired the van, and she explained that Gordo had given it to her as a gift. When the agents asked whether Martinez knew that there was a hide in the vehicle, she responded, "Never. If I had known, I would have never taken it. I went everywhere in that vehicle with my kids, with my family, with my whole family." The government asked Martinez to explain where she thought the drugs were hidden when she was driving back to Rhode Island if not in a hide in her car. Martinez explained, "when I got in the vehicle I was looking

- 9 -

everywhere. I was trying to figure out where it was. I couldn't find it. I tried everywhere. I was going crazy trying to figure out where could it be, because I wanted to take it out."

The government then asked Martinez whether she ever had large quantities of cash -- "over $100,000" -- in her possession. Martinez stated, "No.  Not in my possession, never."  The agents then showed Martinez one of the photographs of cash that was taken with the camera on her phone and asked whether she recognized it:

> **Government:** This picture was taken on your phone on October 6th, 2016 at 11:59 a.m. . . . .
>
> **Martinez:** I'm looking at you in the eye so that you know that I'm telling the truth, I didn't take that picture.

The agents proceeded to show Martinez a series of similar photographs taken on her phone on the same date.  Martinez denied taking any of the pictures or having any knowledge of how they came to be on her phone.  She insisted that she thought she was in Santo Domingo -- with her phone -- at the time the photographs were taken.

The agents then showed Martinez the video depicting the open hide in her van.  The agents asked Martinez whether she recognized the video.  She responded that she had seen the video for the first time at her lawyer's office.  The agents then told her that metadata showed that the video was taken with her phone

on November 8, 2016, at a rest stop on Interstate 95 in New Haven, Connecticut.  They asked her to explain it:

> **Martinez:** Once a guy who was my boyfriend sent me a video similar to that, but, it wasn't that one. . . .
>
> **Government:** You're not understanding me. The . . . evidence from your phone shows that the camera on your phone made that video.
>
> **Martinez:** But, how if I wasn't even here. I don't remember that. I didn't know where the compartment was. I cannot tell you that I know where it was if I didn't know. I don't know what it was. I don't know how to open that. I cannot tell you something that would be a lie.

The government ended the discussion because it concluded that Martinez was not telling the truth.  Martinez insisted, "I'm looking at you in the eyes and I'm telling you the truth. . . . How do you want me to tell you that I know something that I don't know about?"

### 3.  Martinez's Request for Safety-Valve Relief and the Government's Opposition

After her safety-valve interview but before sentencing, Martinez filed a motion for a downward variance from the applicable guidelines range -- 70-87 months -- and for application of the safety valve.  In its opposition, the government challenged only the fifth criteria for safety-valve relief, which, as noted above, requires a defendant to provide truthful and complete disclosures to the government.  See § 3553(f)(5).  The government argued that Martinez's "feigned ignorance concerning narcotics and narcotics trafficking," as well as her claim that "the February 21, 2017

- 11 -

incident was her first and only foray into drug trafficking," were "not only false but, quite frankly, laughable."

In support of its view, the government cited various communications found on Martinez's phone. For example, the government highlighted excerpts of WhatsApp conversations between Martinez and Gordo that appeared to contradict her claim of ignorance. In one such exchange on February 7, 2017, the pair discussed drug raids in Boston:

> **Martinez:** Hey but they're already doing raids
>
> **Martinez:** You know, trouble's heating up in Boston
>
> **Gordo:** Don't you know it
>
> **Gordo:** They should be careful
>
> **Martinez:** Don't you know it
>
> **Gordo:** Thank God I got out of that
>
> **Martinez:** Hahahaha
>
> **Martinez:** But you're going back
>
> **Gordo:** Hahahaha
>
> **Martinez:** Someday
>
> **Gordo:** I'm not
>
> **Martinez:** Of course you are
>
> **Gordo:** Ok
>
> **Martinez:** When everything calms down
>
> **Gordo:** Yeah, Ok
>
> **Martinez:** That's right
>
> **Gordo:** Do you think I want to go to jail
>
> **Martinez:** But the thing is, you keep a low profile

**Martinez:** No, with the buzz that you were here[7]

**Gordo:** What do you mean, buzz

**Martinez:** That's right

**Martinez:** The big kahuna

**Gordo:** The only one who got me into trouble was you with your people

On February 16, 2017 -- the Thursday before Martinez's Tuesday trip to New York -- Martinez and Gordo had the following conversation:

**Gordo:** I spoke with Peluca

**Martinez:** What did she tell you

**Gordo:** He told me that on Monday he's going to give me 5 to test the friend

**Martinez:** [a series of five emojis][8]

**Martinez:** That's good

**Gordo:** Don't you know it

**Gordo:** Are you sure you're going on Tuesday

**Gordo:** You heard

**Martinez:** Yes

**Martinez:** I'd hear that even if I were deaf

The next relevant communication cited by the government took place the day of the New York trip. Gordo sent Martinez the following message before she left Rhode Island:

**Gordo:** Look, he's calling you and they're telling me it shows up as off

---

[7] A translation note in the transcript labels this comment "ambiguous" and suggests that the proper translation may be "not with the buzz that you were here."

[8] The emojis apparently depicted a person holding their hands up in the air.

**Martinez:** 4015430177[9]

**Martinez:** [blank message]

**Gordo:** Ok

**Martinez:** They're calling me now

The call log from Martinez's phone reveals that, moments after sending her cell phone number to Gordo, she received a 33-second phone call from the number 1(929)424-1961. Shortly after that call, Martinez engaged in the following text message exchange with that number:

**1(929)424-1961:** 73-21 Kissena blvd queens

**1(929)424-1961:** Call me when you're there

**Martinez:** Ok

The address texted to Martinez corresponds to a Walgreens Pharmacy in Queens. Martinez's call log and cell site data confirm that, on February 21, 2017, Martinez's cell phone arrived at the Walgreens in Queens and called the number that sent her the address.

During her trip back to Rhode Island that night, Martinez advised Gordo of her status and location via WhatsApp until just moments before she was arrested:

**Martinez:** All chill at exit 90

**Gordo:** Ok

**Martinez:** Ok

---

[9] The phone number Martinez sent to Gordo via WhatsApp was the number assigned to her iPhone (the one that was seized by police). That number is different from the phone number assigned to her WhatsApp account.

**Gordo:** What's up, love

**Martinez:** Here in my space now

**Martinez:** At exit 7

**Gordo:** Ok

**Martinez:** The police stopped me

**Martinez:** Let me see what they're going to say to me

**Martinez:** God willing everything will be Ok

**Gordo:** Ok

**Martinez:** Ok

**Gordo:** Were you driving fast

**Martinez** No

**Martinez:** I believe it's because of the broken window

**Gordo:** Ok

**Martinez:** Ok

**Gordo:** Call me to get you out[10]

**Gordo:** Call me

**Martinez:** What

**Gordo:** . . . . Erase everything on the cell[11]

Based on the evidence it described, as well as a "common sense understanding of how drug organizations operate," the government characterized Martinez's attempt to "portray this transaction as her first foray into the drug world, thrust upon her by unfortunate financial circumstances," as "nonsensical and unworthy of belief." The government argued that the various

---

[10] A translation note in the transcript labels this message as "ambiguous."

[11] Martinez apparently tried to erase all communications with Gordo, but they were recovered during the government's data extraction.

WhatsApp messages demonstrated that Martinez and Gordo had a level of familiarity that allowed Gordo to feel comfortable sharing with Martinez the sensitive details of his involvement in a criminal enterprise. Moreover, the government argued, Martinez's call log and text messages with the unidentified number -- the one that provided her with the Walgreens address in Queens -- contradicted Martinez's claims that she remained at her aunt's house for the duration of her time in New York while Ortiz orchestrated the placement of the drugs in the hide.

The government also pointed to the photos of large amounts of cash and the video of the hide that were taken with the camera on Martinez's cell phone. The government emphasized that Martinez had no plausible explanation for who was responsible for taking the photos and video with her phone, or how they otherwise came to be on her phone. Moreover, the government produced travel records confirming that Martinez was not, as she had claimed during her safety-valve interview, in Santo Domingo when the photos and video were taken.[12]

The government argued that this evidence showed that Martinez did not fully disclose what she knew during her safety-valve interview in an attempt to minimize her involvement in the

---

[12] Martinez did travel to Santo Domingo in October 2016. However, she was there from October 12 to November 2, and the pictures and the video were taken on October 6 and November 8, respectively.

criminal enterprise and to protect other members of the conspiracy. The government characterized the information provided by Martinez as "inherently contradictory, easily dismissed as unworthy of belief through the application of logic, or simply devoid of any meaningful detail." Accordingly, the government asked the court to sentence Martinez to the mandatory minimum sentence of five years.

**4. Sentencing Day One**

On February 4, 2019, the district court convened a sentencing hearing. The court set forth the applicable guideline calculations and then heard defense counsel's objections to the government's opposition to safety-valve relief. Defense counsel argued that the government's portrayal of the safety-valve interview was inaccurate. For example, defense counsel noted that the government had asserted that Martinez claimed to be unaware that her van contained a hide, but the interview transcript revealed that she admitted knowing about the hide and claimed only that she had been unable to find it. Defense counsel also explained that "Peluca" was a nickname for a person who worked at a hair salon owned by Gordo and any references to Peluca must be related to the salon and not drugs. Defense counsel provided similar innocent explanations for each piece of evidence the government had offered as proof of Martinez's undisclosed involvement in drug trafficking.

After hearing argument from both parties, the district court asked government counsel whether it thought Martinez was "entitled to have an opportunity to explain" the text message conversations referenced in the government's sentencing memorandum, specifically the one in which Gordo refers to "5 to test the friend." The court explained: "what I'm grappling with is . . . you said 45 minutes was enough, we know she's lying, we don't have to sit there forever. [Defense counsel] gets up and says you're totally misrepresenting what that exchange is about and she can explain it. . . . Do you think they're entitled to that opportunity?" The government responded, "I think the court has the ability to offer them the opportunity," but insisted that there was other evidence available in the record to show Martinez was lying.

Ultimately, the court determined that Martinez should be afforded a "broader exploration" of the alleged falsehoods identified by the government. The court suspended the sentencing hearing and ordered that it be rescheduled after the government conducted a supplemental safety-valve interview, at which the government "ought to . . . explore[] very explicitly" issues such as "the video, for example, the photos of the New York complaint, for example, the text message exchange [regarding '5 to test the friend'] which [defense counsel] says [Martinez] was never given an opportunity to explain what that means." The court added that

the government need not "go back and repeat everything," but it should ask Martinez, "do you have anything else to say or anything else to add; this is what you said, is that, do you stand by that" in addition to "mov[ing] on to []other areas."

### 5. Supplemental Safety-Valve Interview

The supplemental safety-valve interview ordered by the court started with the government asking Martinez again whether she had ever talked to Gordo about drugs or drug trafficking. Martinez insisted that she had not. The government asked Martinez why she and Gordo had, on several occasions, sent each other articles about drug raids and arrests for drug trafficking in New England and the Dominican Republic. Martinez said simply, "[t]hat's what [Gordo] does," but that it was "not anything [she] had to do with."

The government proceeded to ask Martinez about specific text message conversations with Gordo. For example, the government asked Martinez about a message she sent to Gordo on October 6, 2016, in which she stated, "[i]t's complete. The package with a thousand was in the hide. Glory to God."[13] The government asked how this message could be squared with Martinez's insistence that she had never trafficked in drugs before the February 2017 incident

_____

[13] This message was not referenced in the government's opposition to the safety valve. Martinez was asked to read the message aloud during her supplemental safety-valve interview, and the interpreter translated it.

- 19 -

and that, prior to that incident, she did not know there was a hide in her vehicle. Martinez explained that the "hide" in that message did not refer to the hide in her van, but instead a hide in a sofa.[14]

Directing Martinez's attention to the conversation in which Gordo told Martinez that "Peluca" was going "to give [him] 5 to test the friend" and asked whether she was "sure [she was] going on Tuesday," the government asked where Martinez was "going on Tuesday that Gordo was asking you about." Martinez responded, "I was going to do something about the salon because we hadn't yet talked about the drugs." She told the government that Peluca worked at Gordo's salon and "doesn't do anything bad" and so the conversation must have had "something to do with the salon."

The government also asked Martinez about the text message she received the day of the New York trip identifying the address of the Walgreens in Queens. Martinez stated that the phone number that sent her the address belonged to Ortiz, her cousin, and she insisted that she never went to the Walgreens. Rather, she claimed, Ortiz sent her the address because he intended to use her phone -- and its GPS feature -- when he drove her van to the Walgreens later that day to meet the supplier. In response, agents

_____

[14] The transcript attributes this statement to Attorney Gendron -- a government attorney -- but context demonstrates that this attribution is an error and that it was Martinez, through her interpreter, who made the statement.

- 20 -

asked Martinez to explain why cell site data and call logs showed that a call was made from her phone to Ortiz's from the Walgreens location. Martinez replied, "I couldn't tell you. My cousin [Ortiz] took the phone. I don't know why he called his own number. I stayed at the apartment."

### 6. Post-Supplemental Interview Sentencing Hearing

The district court reconvened Martinez's sentencing hearing on May 31, 2019. After the government again opposed application of the safety valve, defense counsel argued that Martinez had been truthful in both safety-valve interviews and had offered reasonable explanations in response to each piece of evidence the government proffered. When defense counsel asked to call Martinez as a witness, the court continued the hearing for a later date to allow counsel to prepare for direct and cross-examination.

The proceedings resumed a month later, and Martinez took the stand. She acknowledged that the day the photos of large amounts of cash were allegedly taken with her phone -- October 6, 2016 -- she was in New York and not in the Dominican Republic. However, she adamantly denied taking the photos. She also testified that the day the video of the hide supposedly was taken with her phone at a Connecticut rest stop at about 9:40 p.m. -- November 8, 2016 -- she had spent the entire day and night in Rhode Island. She stated that she voted at about 1 p.m. (and produced

a selfie photo that she had posted on Facebook after she had voted), went to the store to buy some groceries, and then was at her home with friends. She denied taking the video.

The government engaged in a brief cross-examination and the court then conducted its own extensive questioning of Martinez. The court asked Martinez to clarify her testimony regarding several text messages and WhatsApp conversations in the record. The court also asked Martinez to explain how her phone got to the rest stop in Connecticut and took a video of the hide in her vehicle, while she remained in Providence to vote and hang out with friends in November 2016. Martinez simply reaffirmed her position that she did not take the video and that she could not explain how it appeared on her phone. Also important to the court was Martinez's explanation of how the photos of cash got on her phone, what she knew about the hide in her vehicle, and why she possessed articles about local drug trafficking.[15]

After the court finished questioning Martinez, it concluded that it could not make a determination as to her safety-valve eligibility until further forensic analysis was completed on the photo that Martinez posted to Facebook after she voted on the day that the government asserted her phone was used in Connecticut

---

[15] We discuss the content of the court's concerns in these areas in detail when analyzing the sufficiency of the court's determination that Martinez was ineligible for safety-valve relief.

to take the video of the hide in her vehicle. The hearing was continued for a day so the government could provide more information on when, where, and how the voting selfie was taken.

When sentencing resumed the next day, before the government provided any additional information about the voting selfie, defense counsel requested a side bar conference at which he asked to recall Martinez to the stand. He also asked that the proceedings be sealed. Over the government's objections, the court allowed Martinez to retake the stand under seal. Martinez admitted that she had not been truthful about the origin of the photos of the cash and the video of the hide.[16] She confessed that an individual she knew only by a nickname had borrowed her phone on October 6, 2016 and had photographed the cash. She explained that the same individual had borrowed both her van and her phone on November 8, 2016, and had taken the video of the hide. She also confessed that she had not been truthful about the WhatsApp conversation with Gordo in which Gordo stated that "Peluca" was going to give him "5 to test the friend." She conceded, "yes, it's true, we were talking about the five kilos."[17]

---

[16] Although this testimony was proffered under seal, these facts were disclosed in the government's brief and, thus, are part of the public record in this case.

[17] This testimony also occurred under seal, but we quote it here because the government's brief discloses that "Martinez admitted that Gordo's text about Peluca sending Gordo '5 to test'

- 23 -

Following Martinez's supplemental testimony, the court concluded, without further mention of the voting selfie, that Martinez was not eligible for safety-valve relief:[18]

> [I]n this case it's clear to me that on a number of fronts the defendant failed to make a truthful disclosure to the government in the course of the two safety valve interviews that she was afforded. I would note that the defendant was given more than one opportunity to do so, and the areas in which she did not make truthful disclosures are many, ranging from her discussion about her involvement in the crime, to the meaning of and the various text messages, to the knowledge with respect to the hide contained in her vehicle, to what happened with her phone at the point which that video on her phone was made, to her failure to disclose how pictures of cash, pictures of court documents from the Southern District of New York, the press releases from the U.S. Attorney's Office in Boston all regarding drug trafficking investigations, and on and on. . . . So the defendant's failure to meet her obligation is vast and is well-reflected in the overall record.

The court added: "I don't think I need to detail chapter and verse all the areas in which the defendant did not truthfully discuss

referred to the five kilograms of cocaine that Martinez would transport the following Tuesday from New York. (SA:34.)"

[18] Martinez contends that the sentencing court did not consider the statements that she made under seal on the last day of sentencing in ruling on the safety-valve issue. That is inaccurate. The purpose of allowing Martinez to testify at sentencing was for the court to assess whether Martinez could demonstrate that she had provided truthful and complete disclosures to the government. She admitted that she had not. The court was free to -- and did -- rely on those admissions to assess Martinez's credibility and whether her prior statements to the government satisfied her disclosure obligation.

- 24 -

these matters with the government.  We discussed it at length in this hearing, and the government has done, I think, an excellent job of chronicling the areas in which the defendant did not truthfully disclose information."[19]

Martinez addressed the court and asked for leniency, blaming her untruthfulness on her fears of retribution.  The court told Martinez:

> The last thing I want to do, the last thing I want to do is to give you five years in prison. I made all sorts of arrangements and efforts to try to avoid doing that, but you have tied my hands and now I don't have any choice. I have no choice but to give you [the mandatory minimum sentence of five years].

Martinez timely appealed.

---

[19] Technically, to be eligible for safety-valve relief, a defendant must make complete and truthful disclosures to the government "not later than the time of the sentencing hearing." 18 U.S.C. § 3553(f)(5).  We have explained that "[t]his means that the deadline for making a truthful and complete disclosure is the moment that the sentencing hearing starts."  United States v. Matos, 328 F.3d 34, 39 (1st Cir. 2003).  Here, however, after the sentencing hearing commenced, the district court determined that Martinez was entitled to a supplemental interview and, thus, suspended sentencing until that interview could be completed.  When sentencing resumed, the court considered the substance of both interviews in assessing Martinez's safety-valve eligibility.  To the extent that the court's reliance on the supplemental interview, which technically occurred after sentencing began, was problematic, the government made no issue of the sequence.

## A. Standard of Review

In safety-valve appeals, the standard of review "varies according to the foundation upon which [the safety-valve] determination is based." United States v. Matos, 328 F.3d 34, 38 (1st Cir. 2003). To the extent safety-valve determinations rest on conclusions of law, our review is de novo. United States v. Padilla-Colón, 578 F.3d 23, 29 (1st Cir. 2009). If such determinations rest on findings of fact, we review for clear error. Id. The district court's assessment of witness testimony involves "fact-sensitive judgments and credibility calls," and thus is reviewed for clear error. Matos, 328 F.3d at 40. Under the "extremely deferential" clear error standard, an appellate court "ought not to disturb either findings of fact or conclusions drawn therefrom unless the whole of the record compels a strong, unyielding belief that a mistake has been made." United States v. Bermúdez, 407 F.3d 536, 542 (1st Cir. 2005) (first quoting United States v. Marquez, 280 F.3d 19, 26 (1st Cir. 2002); and then quoting Matos, 328 F.3d at 40).

## B. Applicable Law

As we have explained, to qualify for relief under the safety valve, a defendant must satisfy five criteria, only the last of which is at issue in this appeal. A defendant will meet that final requirement only if the sentencing court finds that:

> not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan . . . .

18 U.S.C. § 3553(f)(5).

The defendant bears the burden of showing that she made "appropriate and timely disclosures to the government." Matos, 328 F.3d at 39. The defendant must "prove to the court that the information [s]he supplied in the relevant time frame was both truthful and complete." Id. The defendant must not only "accurately" answer the government's questions, but also must "volunteer [relevant] information even if the government fails to ask for it." United States v. Feliz, 453 F.3d 33, 37 (1st Cir. 2006). In that sense, a safety-valve debriefing is "a situation that cries out for straight talk; equivocations, half-truths, and veiled allusions will not do." Matos, 328 F.3d at 39. In sum, "full disclosure is the price that Congress has attached to relief under the [safety-valve] statute." United States v. Montanez, 82 F.3d 520, 523 (1st Cir. 1996).

In opposing safety-valve relief, the government may not "assure success simply by saying, 'We don't believe the defendant,' and doing nothing more." United States v. Miranda-Santiago, 96 F.3d 517, 529 (1st Cir. 1996). "[W]here a defendant in her submissions credibly demonstrates that she has provided the

government with all the information she reasonably was expected to possess," the government must "at least come forward with some sound reason to suggest" that the defendant's proffer is untruthful or incomplete. Id. at 529 n.25. The government is not required, however, to introduce independent rebuttal evidence. Marquez, 280 F.3d at 24. Looking to the record as a whole, a district court must make its own "independent determination as to whether [a defendant] has satisfied" her safety-valve disclosure obligation. United States v. White, 119 F.3d 70, 73 (1st Cir. 1997). In exercising that discretion, the district court "must be fair and practical." Feliz, 453 F.3d at 37.

### III.

Martinez contends that the district court erred in concluding that she was ineligible for safety-valve relief because she failed to disclose truthfully and completely the information that she possessed concerning her offense of conviction. She asserts that any omissions, inconsistencies, or misstatements in the record are either unrelated to her offense conduct or immaterial, and, thus, cannot justify denial of safety-valve relief.

### A. Scope of Relevant Information

Martinez describes her offense of conviction as a single incident of transporting cocaine on February 21, 2017. According to Martinez, information not directly relevant to her trip to New

York is "beyond the appropriate scope of factual inquiry for safety valve purposes." We review de novo the district court's legal interpretation of the scope of § 3553(f)(5).

By classifying her offense narrowly as a single incident of transporting cocaine from New York to Rhode Island, Martinez overlooks the fact that, in addition to one count of possession of cocaine with intent to distribute, she pled guilty to a conspiracy charge involving several other unidentified coconspirators.[20] Count I of the Information alleges -- and Martinez admitted -- that she participated in a conspiracy to distribute cocaine with "known and unknown" others that began at "a time unknown, but at least on . . . February 21, 2017."

By its terms, § 3553(f)(5) requires a defendant to disclose "all information or evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5) (emphasis added). Application note 3 to § 5C1.2 of the Sentencing Guidelines -- the provision that corresponds to 18 U.S.C. § 3553(f) -- explains that the phrase "offense or offenses that were part of the same course of conduct or of a common scheme or plan," as used in the safety-valve provision, means "the offense of conviction

_____

[20] Indeed, the conspiracy charge was, at Martinez's request, intentionally broadened to reflect a conspiracy with persons other than her boyfriend Espinal.

- 29 -

and all relevant conduct." U.S.S.G. § 5C1.2 cmt. 3. Where, as here, the offense of conviction involves a conspiracy to engage in criminal activity with others, the relevant conduct that must be disclosed includes any information the defendant has about the conduct -- her own or that of her co-conspirators -- taken "in furtherance of [the jointly undertaken] criminal activity." U.S.S.G. § 1B1.3(a)(1)(B);[21] see also United States v. Mulero-Algarín, 535 F.3d 34, 40 n.2 (1st Cir. 2008) (noting the "expansive" scope of the § 3553(f)(5) disclosures). Hence, we reject Martinez's attempt to limit the scope of her required disclosures to those that directly concern the events of February 21, 2017.

**B. Adequacy of the Record**

Our conclusion that the evidence considered by the district court was comfortably within the scope of § 3553(f)(5)'s disclosure requirement, an issue of law, leaves only the question of whether the district court clearly erred in finding that Martinez was ineligible for safety-valve relief. See Marquez, 280 F.3d at 26. As we have explained, the clear error standard of review is "extremely deferential," Bermúdez, 407 F.3d at 542 (quoting Marquez, 280 F.3d at 22), and we will not disturb a

---

[21] Section 1B1.3 of the Sentencing Guidelines outlines "relevant conduct" in the context of determining a sentencing guidelines range.

district court's factual finding that a defendant failed to make a truthful and complete disclosure to the government without compelling support that a mistake has been made. Matos, 328 F.3d at 40.

Martinez asserts that the district court's denial of her safety-valve eligibility rests on nothing more than "innuendo, impressions, and characterizations of her proffer," rather than "substantial, specific factual misstatements." She also claims that the district court did not support its decision in a sufficiently detailed manner.

We disagree.[22] The district court engaged in a lengthy and detailed questioning of Martinez at sentencing. It then expressed skepticism about Martinez's explanations and claimed ignorance. When imposing its sentence, the district court listed several of the areas in which it found Martinez's proffer lacking, and observed that it did not "need to detail chapter and verse all the areas in which the defendant did not truthfully discuss th[o]se matters with the government" because those issues had been "discussed . . . at length in th[e] hearing," and the government

_____

[22] In any event, we note that, in this circuit, "[a]lthough it is preferable that the court support its decision [to deny safety-valve relief] with 'specific factual findings,' a district court may rest its decision on conclusory statements if those conclusions have 'easily recognizable support in the record.'" United States v. Bravo, 489 F.3d 1, 12 (1st Cir. 2007) (quoting Miranda-Santiago, 96 F.3d at 529)).

had done "an excellent job of chronicling the areas in which the defendant did not truthfully disclose information." Ultimately, the court concluded that Martinez's "failure to meet her obligation is vast and well-reflected in the overall record."

We review several of the areas identified by the district court and, like the district court, rely on the transcript of the sentencing hearing and the arguments of the government to demonstrate the sufficiency of the court's finding that Martinez was not being truthful and, thus, was not entitled to the safety valve.

### 1. Meaning of Various Text Messages

The district court concluded that one of the "areas in which [Martinez] did not make truthful disclosures" was "the meaning of . . . the various text message conversations." The most troublesome of those conversations to the court was the one in which Martinez and Gordo discussed someone named "Peluca" giving Gordo "5 to test the friend," in response to which Martinez sent a series of excited emojis and confirmed that she was "going on Tuesday." During cross-examination at sentencing, Martinez insisted that "[she] didn't understand what [Gordo] was talking about because . . . Peluca's not involved with drugs." Martinez claimed that Peluca was "just someone that combs hair" and so she and Gordo must have been discussing something about the salon in that conversation. Martinez even expressed frustration at the

notion that she would have agreed to transport five kilos for a mere $2,000, telling the government "I never talked about five kilos. My understanding was about one kilo, and for one kilo I was going to be paid $2,000. Do you really . . . believe that I would commit to five kilos and get paid only $2,000? That doesn't make any sense."

Following up on the government's cross-examination, the court asked Martinez to clarify whether that conversation was actually about Martinez going to New York on Tuesday to retrieve five kilograms of cocaine. Martinez insisted she was being "very, very honest" that "as far as those five kilos, there was never any conversation or any agreement about those five kilos," and the discussion about Peluca "ha[d] nothing to do with drugs."

Unconvinced, the court directed Martinez's attention to the WhatsApp conversation in which she and Gordo discussed drug raids "heating up" in Boston:

> I have a real hard time believing you when you say that you don't know what's going on in this conversation about Peluca that you're having with Gordo and the five coming for a test when I read all those prior text messages between you and Gordo that have to do with drug trafficking and drug raids in Boston and the Dominican Republic and all -- and there's a long, long discussion with the two of you that makes it obvious that you and Gordo -- that you're discussing drug trafficking on a serious level.

- 33 -

Martinez responded, "I'm not really sure how to explain this better," and insisted again that the conversation was not about five kilograms of cocaine or her Tuesday trip to New York City.

The very next day, however, Martinez did an about-face when she got back on the stand. In response to defense counsel asking Martinez to tell "the truth" about what she understood the "5 to test" message to mean, Martinez finally disclosed that she had been lying: "Well, sitting here now, and very aware that what I'm saying if I say the truth risks my life, yes, it's true, we were talking about the five kilos."

In short, Martinez admitted that she had not been truthful to the government about information directly related to the circumstances of the offense that resulted in her arrest. She sought to conceal the fact that she knew, several days before she arrived in New York, that she would be transporting five kilograms of cocaine to Rhode Island for Gordo. Her admission also contradicts her claim that she agreed to transport only a single kilogram and got into an argument with her cousin because she felt coerced into transporting two kilograms. It also reveals that Peluca was a member of the conspiracy -- the source of the "5 to test" -- and not simply a hairdresser as Martinez had claimed on several occasions. Martinez's deliberate choice to lie to the government, and the court, about the meaning of her "5 to test" conversation with Gordo plainly supports the district court's

finding that she did not provide truthful information about her crime to the government. Indeed, despite this lie being a primary focus of the district court, Martinez does not even attempt to explain it away or minimize it on appeal.[23]

### 2. Knowledge of the Hide

The court also concluded that Martinez was not truthful with the government regarding her "knowledge with respect to the hide contained in her vehicle [and] what happened with her phone at the point which that video [of the hide] on her phone was made." During her safety-valve interview, Martinez insisted that she did not know there was a hide in her vehicle, claiming that, "[i]f [she] had known, [she] would have never taken" the car from Gordo. The government asked Martinez where, then, she thought the drugs were hidden when she was driving back to New York if not in a hide. She explained that she searched the vehicle thoroughly but could not locate the hide.

At sentencing, the court focused on the video of the hide that was, according to the metadata, taken with Martinez's phone at a rest stop in Connecticut. The court told Martinez, "you have to convince me that somehow your phone got to the rest stop in Madison, Connecticut, and took a video of a hide in your

---

[23] Martinez simply avoids the issue by stating that the district court did not take into account her testimony under seal on the last day of sentencing. As we have already explained, see supra note 18, that is an inaccurate reading of the record.

vehicle . . . [but] you never left Providence." Martinez insisted, "I swear, I absolutely swear that I never left my home and that I never took that video.  I can't understand how it appears on my phone.  I swear, I swear to God, that phone and I never left the state of Rhode Island.  I was home all night.  I swear so.  I cannot explain it, but that's the truth."

The court was unconvinced and told Martinez, "I'm having a hard time seeing the truth here because there's only two possibilities . . . you took that video or . . . somebody else took that video.  And you certainly would remember if you gave your phone and your car to somebody else. . . ."  Martinez responded plainly that she "never saw the hide in [her] car," that she saw the video of the hide for the first time at her lawyer's office, and that she could not explain how it appeared on her phone.

As a follow-up, the court asked Martinez how she could say she did not know there was a hide in her vehicle when, on October 6, 2016, she texted Gordo, "I'm going to the van to check it really well," and, a few moments later, "[t]he package with the thousand was in the hide.  Glory to God."  Martinez responded that, at the time she sent that message, she was in Gordo's home and he had asked her to "receive" "about 40,000 or 38,000 dollars" in cash and count it.  When she told Gordo she found "[t]he package with the thousand . . . in the hide," she claims that she was telling Gordo that she had located some missing cash in "a hiding

spot in the house [in] the couch" not the one in her car. She had no coherent explanation for what she meant when she said immediately before that she was "going to the van to check it really well."

When she got back on the stand the next day, Martinez confirmed that she had lied and that she knew precisely where the video of the hide on her phone had come from. She explained that an individual she knew only by his nickname had borrowed her phone and her vehicle and had taken the video of the hide. That individual was frequently referenced in Martinez's communications with Gordo, and those messages reveal that the individual was deeply involved in the drug trafficking conspiracy in which Martinez admitted she participated. Her failure to disclose that information to the government not only concealed the involvement of a coconspirator but also concealed the facts that Martinez knew about the hide as early as November 2016 and that she had allowed coconspirators to use her vehicle and her phone to engage in drug trafficking activities in furtherance of the conspiracy.

Martinez claims that this is an irrelevant and immaterial inconsistency. She argues that it does not matter that she did not disclose the origin of the video of the hide because she admitted to knowing there was a hide in the vehicle at the time of the offense. Again, however, the import of the information was not only whether she knew a hide existed, but rather when she

knew and who else knew. Hence, Martinez's failure to disclose the extent of her knowledge of the hide supports the district court's finding that she was ineligible for safety-valve relief.

### 3. Pictures of Cash

Also important to the court's conclusion that Martinez was not being truthful was "her failure to disclose how pictures of cash" came to be on her phone despite metadata showing that the pictures were taken with the camera on her phone on October 6, 2016. During her safety-valve interview, Martinez claimed that she did not recognize the photos or know how they appeared on her phone. At sentencing, she echoed that sentiment. On the last day of sentencing, however, Martinez testified under seal that the same individual who had taken her phone and car to take the video of the hide had also taken her phone on October 6th and taken pictures of cash.

Martinez's obvious obfuscation regarding the photos of cash support the district court's finding of ineligibility. Not only did Martinez admit she was lying, the evidence in the record suggests that even her disclosure under seal blaming the origin of the photo on a coconspirator may have been false. The government pointed out to the court at sentencing that the photographs of cash were taken on October 6, 2016, the same day that Martinez admitted she was alone at Gordo's home, texting him from her phone, and counting "40,000 or 38,000" dollars. If Martinez was using

her phone to text Gordo alone at his home while counting his money, it is unlikely that someone else took her phone to take pictures of cash that same day.

Martinez claims that any inconsistencies regarding the identity of the photographer are irrelevant because she disclosed having been in the presence of large quantities of drugs in the past. Again, however, she misses the point. The photos either (1) tended to prove that a coconspirator -- the same one that used her phone and car on November 8, 2016 to take the video of the hide in Connecticut -- also used Martinez's phone more than a month earlier to photograph a large amount of cash, or (2) showed that Martinez herself was involved in the conspiracy as of that date. Both of those facts are relevant to the conspiracy charge and support the district court's finding that Martinez was not truthful with respect to information regarding her offense.

### 4. Other Incomplete or False Disclosures

The district court also considered several other inconsistencies or omissions in its assessment of Martinez's eligibility for safety-valve relief. For example, the court found it suspicious that Martinez's phone possessed several articles and court documents about drug trafficking investigations in New York, Boston, and the Dominican Republic. Martinez argued that she possessed those documents because she knew Gordo was involved with drugs and was concerned for his wellbeing. The government argued

that "these things on her phone are not out of a sense of mere curiosity but because . . . she's a player in the game." The court agreed with the government and incorporated its reasoning in ultimately concluding that Martinez did not truthfully disclose why she possessed images of court documents and press releases about drug trafficking on her phone.

The court also concluded, relying on examples proffered by the government, that Martinez was not truthful "about her involvement in the crime." For example, the government argued that Martinez lied about whether she, rather than Ortiz, traveled to the Walgreens in Queens to meet the supplier and orchestrate the placement of the drugs in the hide. According to the government, that story could not be squared with the fact that Martinez's phone called Ortiz's phone from the vicinity of the Walgreens, consistent with an instruction Ortiz gave to Martinez via text message. When the government asked Martinez if it was actually she who traveled to the Walgreens and made that call, she said, "No, no, no, that wasn't me because when I got to my . . . auntie's house, I gave my cousin [Ortiz] my phone." The government asked her to explain why Ortiz would have taken her phone and car to the Walgreens and, upon his arrival, called his own phone with her phone consistent with the instruction he had texted her. Martinez simply stated that she did not know why her cousin called himself with her phone and that the government would have to ask

him that question.  Martinez's nonsensical answer tends to show, as the government argued at sentencing, that Martinez sought to distance herself from the crime for which she was arrested and, thus, supports the district court's conclusion that Martinez was not truthful in her disclosures.

### 5.    Conclusion

We discern no error in the district court's reasoned assessment of Martinez's eligibly for safety-valve relief. Martinez points out that safety-valve relief cannot be denied based on "trivial inconsistencies" or "inconsequential omissions." Matos, 328 F.3d at 42.  But her attempt to classify each of her mistruths as unimportant blunders strains credulity.  The falsehoods identified by the court, supported with evidence by the government, and the record as a whole, amply justify the district court's finding that Martinez failed "truthfully [to] provide[] to the [g]overnment all information and evidence [she] ha[d] concerning" her offenses and thus was not eligible for relief under the safety valve.  18 U.S.C. § 3553(f)(5).

Affirmed.